SMITH CORONA
CORPORATION, Plaintiff,

v.

UNITED STATES, Defendant,

and

Brother Industries, Ltd., Brother International Corp., Nakajima All Co., Ltd., Canon Inc., Canon U.S.A., Inc., Silver Seiko, Ltd., Silver Reed America, Inc., Matsushita Electric Industrial Co., Ltd., Kyushu Matsushita Electric Industrial Co., Ltd. and Panasonic Company and Panasonic Industrial Company, Divisions of Matsushita Electric Corporation of America, Intervenors–Defendants.

Court No. 87–02–00157.

United States Court of
International Trade.

Dec. 31, 1987.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr. and John M. Breen (Robert E. Walton, Smith Corona Corp., of counsel), for plaintiff.

Richard K. Willard, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Velta A. Melnbrencis, and Office of the Deputy Chief Counsel for Import Admin., U.S. Dept. of Commerce, Deborah A. Persico, for defendant.

Tanaka Ritger & Middleton, H. William Tanaka, Patrick F. O'Leary and Alice L. Mattice, for intervenors-defendants Brother Industries, Ltd. and Brother Intern. Corp.

McDermott, Will & Emery, R. Sarah Compton, Kurt J. Olson and John H. Walsh and Patton, Boggs & Blow, Frank R. Samolis, Michael D. Esch and Jeffrey L. Turner and Benjamin L. Irvin, for intervenor-defendant Nakajima All Co., Ltd.

Covington & Burling, Harvey M. Applebaum and David R. Grace and Delson & Gordon, Norman Moloshok and Jeffrey M. Samberg, for intervenors-defendants Canon Inc. and Canon U.S.A., Inc.

Willkie Farr & Gallagher, Christopher Dunn and Zygmunt Jablonski, for intervenors-defendants Silver Seiko, Ltd. and Silver Reed America, Inc.

Weil, Gotshal & Manges, A. Paul Victor, Stuart M. Rosen and Charles H. Bayar, for intervenors-defendants Matsushita Elec. Indus. Co., Ltd., Kyushu Matsushita Elec. Indus. Co., Ltd. and Panasonic Co. and Panasonic Indus. Co., div. of Matsushita Elec. Corp. of America.

## MEMORANDUM AND ORDER

AQUILINO, Judge:

In this action seeking judicial review of the final results of an antidumping-duty administrative review conducted by the International Trade Administration, U.S. Department of Commerce and reported *sub nom. Portable Typewriters From Japan*, 52 Fed.Reg. 1,504 (Jan. 14, 1987), intervenor-defendants Brother Industries, Ltd. and Brother International Corp. have interposed a motion to dismiss part of this action, while the plaintiff has moved for partial judgment on the administrative record and also seeks suspension of liquidation of entries of certain portable electronic typewriters claimed to be within the ambit of the administrative proceeding.

### Background

Facts outlining earlier history of this proceeding are set forth in *Smith Corona Group, SCM Corp. v. United States*, 8 CIT 100, 100–02, 593 F.Supp. 415, 416–17 (1984). That action, CIT No. 84–01–00046, in which the plaintiff challenges a December 1983 letter ruling by the Commerce Department that the Brother model EP–20 typewriter is "not within the class or kind of merchandise covered by the antidumping duty order on portable electric typewriters from Japan", has been consolidated with this one.

The first seven counts of plaintiff's amended complaint take issue herein with the January 14, 1987 results of the administrative review of a May 9, 1980 antidumping-duty order covering portable electric typewriters ("PETs") of the Brother intervenor-defendants and of intervenor-defendants Silver Seiko, Ltd. and Silver Reed America, Inc. ("Silver S/RA"). Counts 8–10 contest the "scope" of that order, as per the following allegations, among others:

34. In the context of the subject annual review proceeding, various respondents made requests to have particular typewriters excluded from the scope of the antidumping duty order. The ITA considered the specific requests for exclusion of 92 model typewriters and laid down general principles regarding the scope of the order for application in subsequent annual review proceedings. 52 Fed.Reg. at 1504–1506.

35. ITA held that "automatic typewriters and typewriters with a calculating mechanism" were excluded from the scope of the underlying antidumping duty order on the basis of classification of imports under the Tariff Schedules of the United States. 52 Fed.Reg. at 1505.

ITA found that the original petition filed by Smith Corona, the underlying less-than-fair-value investigation, and the underlying injury investigation had specifically and intentionally excluded from the antidumping investigation all automatic typewriters and typewriters with a calculating mechanism.

The court, over the opposition of the Brother intervenor-defendants but not of either the defendant or Silver S/RA, has enjoined liquidation of PET entries at issue in counts 1–7. The court has also granted a consent motion to "bifurcate the issues" pursuant to which the plaintiff has interposed a motion for judgment on counts 8–10 on the administrative record. Defendant's response to this motion has been to propose a remand to the International Trade Administration ("ITA") "for reconsideration of its determination and publication of a revised determination with regard to portable electric typewriters incorporating calculators or text memory"[1] based upon the following rationale:

After reviewing the administrative record in this case along with arguments advanced by plaintiff in support of its motion for judgment upon the agency record, the ITA concedes that its determination that PETs incorporating calculators or text memory were specifically excluded from the original investigation and order is not supported by substantial evidence in the administrative record. Furthermore, Commerce concedes that its prior conclusion to the effect that under the criteria established in *Diversified Products [v. United States*, 6 CIT 155], 572 F.Supp. 883, PETs incorporating calculators or text memory should be excluded from the scope of the outstanding antidumping duty order on portable electric typewriters from Japan is not supported by substantial evidence. Therefore, the Department requests that that part of this consolidated case which deals with the scope issue (the entire Court No. 84–1–00046 and Count 8 of the complaint in Court No. 87–02–00157) be remanded so that it can reconsider its scope determination and publish a revised scope determination which would be supported by substantial evidence in the administrative record.[2]

The intervenor-defendants take the position that the record does support the ITA's ruling(s) regarding their products, and, save Silver S/RA, they therefore pray that plaintiff's motion for partial judgment be denied.

Subsequent to the filing of defendant's response, the plaintiff sought an order to show cause why there should not be an immediate (1) remand to the ITA of the scope issue and (2) suspension of liquidation of "entries of all portable electric typewriters incorporating calculating devices or text memory and entered under item 676.07 or 676.25, Tariff Schedules of the United States".[3] The latter relief is requested on the alternative grounds of the agency's own initiative or a preliminary injunction. A hearing was held on plaintiff's application for injunctive relief, which is opposed by the defendant and the intervenor-defendants.

I

As indicated above, the Brother intervenor-defendants have filed a motion to dismiss counts 8–10 of the complaint on the ground of lack of subject-matter jurisdiction. This motion, which has not been joined in by the other intervenor-defendants, is opposed by both the plaintiff and the defendant.

The gist of the motion is that the May 9, 1980 antidumping-duty order, 45 Fed.Reg. 30,613, "expressly excluded automatic typewriters and machines incorporating a calculating mechanism".[4] It relies on *Royal*

1. Defendant's proposed order, pp. 1–2 (filed Sept. 14, 1987).

2. Defendant's Response to Plaintiff's Motion for Judgment on the Agency Record, p. 5.

3. Order to Show Cause, p. 2 (Nov. 2, 1987).

4. Memorandum of Brother Industries, Ltd. and Brother International Corporation in Response to Smith Corona Corporation's Reply Brief as It Relates to the Jurisdictional Issue, p. 3.

*Business Machines, Inc. v. United States,* 1 CIT 80, 507 F.Supp. 1007 (1980), *aff'd,* 669 F.2d 692 (CCPA 1982), and *Alsthom Atlantique v. United States,* 787 F.2d 565 (Fed.Cir.1986).

Neither case, however, warrants dismissal of the contested counts due to lack of jurisdiction. While *Royal* involved a challenge to the scope of the very same May 1980 order underlying this action, and while that action was indeed dismissed for lack of jurisdiction, the result was predicated upon a finding, affirmed on appeal, that the plaintiff's typewriter had been "included in the administrative investigations from their commencement until their ... final determinations"[5] and thus the conclusion of law that the action had been commenced beyond the pertinent period of limitation.

Similarly, the court of appeals in *Alsthom* concluded that the merchandise in question had been covered by the original antidumping determination and that the plaintiff's challenge to its scope was too late and thus properly dismissed.

■ Here, the lapse of more than seven years since entry of the underlying order, during which time technology has not stood still, makes the instant motion facially appealing, but the court cannot overlook the fact that the typewriters in question did not exist in 1980[6] and therefore could hardly have been "explicitly excluded" that year from the antidumping order. Moreover, both courts in *Royal* foresaw that

certain grievances may arise between the final determinations and the administrative review of the final determinations, under 19 U.S.C. § 1675 for which 19 U.S.C. § 1516a would be manifestly inadequate. In those instances, the right of action under 5 U.S.C. § 702 and the Court's broad residual jurisdiction under 28 U.S.C. § 1581(i) will serve to maintain the comprehensive system of judicial review established by the legislature.[7]

This foresight was confirmed in the 1984 action consolidated herein, where the Brother intervenor-defendants sought, unsuccessfully, dismissal for lack of subject-matter jurisdiction over the issue of exclusion of their EP–20 from this proceeding. *See Smith Corona Group, SCM Corp. v. United States, supra* page 286. Finally, both *Royal* and *Alsthom* had been commenced prior to 1984, during which year the Trade and Tariff Act, Pub.L. 98–573, 98 Stat. 3040, was enacted. Section 623(a) of that statute added a subparagraph (vi) to 19 U.S.C. § 1516a(a)(2)(B), thereby making reviewable by this court a

determination by the administering authority as to whether a particular type of merchandise is within the class or kind of merchandise described in an existing finding of dumping or antidumping or countervailing duty order.

It is just such a determination, reported January 14, 1987, which counts 8–10 of plaintiff's amended complaint contest. Since this challenge was commenced within 30 days of that date, the court has jurisdiction in accordance with 19 U.S.C. § 1516a and 28 U.S.C. § 1581(c).

## II

■ The intervenor-defendants argue correctly that, notwithstanding defendant's acquiescence in plaintiff's demand for a remand, the court should reach the merits and draw its own conclusions as to whether the ITA's determination as to scope is supported by substantial evidence on the record.

In *Badger–Powhatan, A Division of Figgie International, Inc. v. United States,* 10 CIT ——, 633 F.Supp. 1364, 1368, *appeal dismissed,* 808 F.2d 823 (Fed. Cir.1986), the court pointed out that agency amendment of its determination is appropriate when it has relied on a legally improper method of reaching that determina-

---

**5.** 1 CIT at 87, 507 F.Supp. at 1014.

**6.** *Cf., e.g.,* Memorandum of Brother Industries, Ltd. and Brother International Corporation in Support of Their Motion to Dismiss Counts 8–10 of the Complaint for Lack of Jurisdiction and in Opposition to Smith Corona Corporation's Mo-

tion for Judgment on the Agency Record with Respect to the Scope of the Antidumping Duty Order, pp. 27–28, 43.

**7.** 1 CIT at 89, 507 F.Supp. at 1015. *See* 669 F.2d at 701–02.

tion or when errors of inadvertence or mistake are discovered, citing *Timken Co. v. United States,* 10 CIT ——, 630 F.Supp. 1327, 1332 (1986); *Melamine Chemicals, Inc. v. United States,* 8 CIT 105, 106, 592 F.Supp. 1338, 1340 (1984); *Timken Co. v. United States,* 7 CIT 319, 320 (1984) [Available on WESTLAW, 1984 WL 3725]; and *Gilmore Steel Corporation v. United States,* 7 CIT 219, 223, 585 F.Supp. 670, 674 (1984). In the absence of such an occurrence, the court in *Badger–Powhatan* held it had to rule on the merits to determine the appropriateness of remand, 10 CIT at ——, 633 F.Supp. at 1369. This court concurs, for actions like this one self-evidently are not just bipartite in nature.

*Royal Business Machines, Inc. v. United States, supra,* had arisen out of Customs Service reclassification of the Royal Administrator typewriter from TSUSA item 676.0510 to 676.0540 ("Typewriters not incorporating a calculating mechanism: Nonautomatic with hand-operated keyboard ... Other: Electric"). This caused the ITA to issue a clarification as to the scope of its May 1980 order. *Portable Electric Typewriters From Japan; Clarification of Scope of Antidumping Duty Order and Correction of Early Determination of Antidumping Duties,* 46 Fed. Reg. 14,006 (Feb. 25, 1981). In concluding therein that the Administrator fell under its order, the ITA defined

> "portable electric typewriters" as all typewriters currently classificable under TSUSA 676.0510, and some currently classifiable under 676.0540, depending on their individual characteristics. *Id.* at 14,007.

The intervenor-defendants contend that this definition is clear and that the agency has abided by it until now. However, the record is also clear that the typewriters at issue on plaintiff's present motion were not in existence at the times of either the filing of its original petition or the issuance of the May 1980 order. Apparently in conjunction with publication of the preliminary results of its first administrative review of that order, the ITA invited any interested party to comment on whether portable *electronic* typewriters were within the scope of

the order. *See* 48 Fed.Reg. at 7,769 (Feb. 24, 1983). Thereafter, the agency concluded that they were, as follows:

> Based on our review of the comments received, the merchandise description in the petition to initiate this case, and the original fair value and injury investigations, portable electronic typewriters are within the scope of the order. In addition to reviewing the investigatory records, the Department's decision here is based on several factors, including: (1) General physical characteristics, (2) the expectations of the ultimate purchaser, (3) the ultimate use of the merchandise in question, and (4) the channels of trade in which the merchandise moves.

> Although electronic typewriters generally have different physical characteristics than the portable electric typewriters investigated during the fair value investigation, there is nothing in the merchandise description in the original petition, or in the fair value or injury investigations, which precludes the inclusion of electronic typewriters. The petition defines the merchandise as: "[a]ll portable electric typewriters, whether utilizing typebars or single elements, and whether fully electric with powered carriage return or with manual carriage return, and whether with conventional ribbons or with cartridge or cassette ribbon". Most electronic typewriters use a daisy wheel print element rather than a typebar or single element; however, all electronic typewriters have a powered carriage return and use a cassette ribbon. The fair value investigation defined the merchandise by its TSUSA item number; we agree that TSUSA alone is not dispositive. In its final report (731–TA–12, USITC Publication 1062, May 1980), the International Trade Commission stated "[a] typewriter is a machine with a manually operated keyboard which produces characters like those of a letterpress as a substitute for handwriting. Typewriters may be portable or standard (office type) units as well as manually or electrically operated. The typewriters which have been sold in the United States at less

than fair value and which are the subject of this investigation are electrically operated portable units (customarily sold at retail with a carrying case)." There is no definition on record for "electrically operated" portable typewriters limiting the scope to an electromechanical unit.

Concerning the second characteristic, the expectation of the ultimate purchaser, we believe that the purchasers of portable electronic typewriters are likely to be the same as those that purchase portable electrics. Our examination of advertising and the channels of trade substantiates that portable electronics are aimed at homes and small offices as ultimate purchases [*sic*].

Concerning the third factor, there is no doubt that portable electronic and portable electric typewriters are used for the same purpose. Finally, as mentioned above, the evidence on hand demonstrates that the channels of distribution are the same for both type [*sic*] of machines.

Therefore, we maintain that portable electronic typewriters are within the class or kind of merchandise covered by this antidumping duty order. *We cannot limit the scope of an order only to merchandise being manufactured at the time of an initiation of an investigation.*[8]

The period of that administrative review was January 4, 1980 through April 30, 1981. The record now before this court indicates that Customs was asked in May 1982 as to the dutiable status of the Brother EP–20, which the Service then character-

ized as a "personal electronic printer . . . light-weight, portable, battery-powered unit with a calculating mechanism

. . . classifiable under the provision for calculating machines, accounting machines, ticket-issuing machines, and similar machines, all the foregoing incorporating a calculating mechanism, other in item 676.25, Tariff Schedules of the United States, and dutiable at the rate of 4.9 percent ad valorem."[9]

Upon presentation of this ruling to the ITA, it agreed with the Brother contention that the EP–20 was outside the scope of the antidumping order.[10]

Since that time, some typewriters exported to the United States have incorporated either an electronic calculator or text-memory function.[11] The ITA's final results of its administrative review indicate 92 requests for purview clarifications. The agency has concluded that the typewriters covered by those requests "reflect subsequent advances in technology not found in the class or kind of merchandise investigated." 52 Fed.Reg. at 1,505 (Jan. 14, 1987). Nevertheless, the ITA determined that those machines "were specifically excluded from the investigation"[12] and therefore are not included in that class or kind.

Secondarily, in its scope determination presently under review herein, the ITA referred to *Diversified Products Corporation v. United States*, 6 CIT 155, 572 F.Supp. 883 (1983). In that case, the court pointed out that the

Trade Agreements Act of 1979 is instinct with the intent that the ITA, not the Customs Service, is responsible for clari-

---

8. *Portable Electric Typewriters From Japan; Final Results of Administrative Review of Antidumping Duty Order,* 48 Fed.Reg. 7,768, 7,769–70 (Feb. 24, 1983) (emphasis added).

9. Record Document ("R.Doc.") 7 (letter from Acting Area Director, New York Seaport to Donald L.E. Ritger, Esq., p. 1 (June 9, 1982)).

10. *See* R.Doc. 11 (July 7, 1982). As indicated above, that determination is also at issue herein.

11. The Brother CE–70, for example, "features a memory for phrases of 8000 characters" [R.Doc. 106, p. 1], and the ITA ruled on February 21, 1984 that that "automatic typewriter" was out-

side the scope of the antidumping order. *See id.* at p. 3.

12. 52 Fed.Reg. at 1,505. No doubt, machines genuinely not included were the IBM "magcard" memory typewriter and competitors generally employed in office or business environments where heavy use is the norm. *Cf. id.*

Apparently, the parties reached agreement below as to a number of the typewriters in question, agreeing that some were covered, some not, and the rest "maybe" not covered by the May 1980 order. *See, e.g.,* R.Doc. 345, Ex. 1. The other machines (approximately 63) remain at issue.

fying, where necessary, the scope of dumping findings and antidumping duty orders.

... [I]t is equally clear that the ITA is in no wise obligated to follow nor is it bound by the classification determinations of Customs when it does clarify the scope of a dumping finding. ... Diversified contends that inasmuch as Customs has classified double-gear hub drive speedometers as "other than" bicycle speedometers, it is error for the ITA to include such speedometers as being within the class or kind of merchandise covered by the 1972 dumping finding. The short answer to this contention ... is contained in the previously quoted portion of the *Royal Business Machines* decision, namely, that "[t]he determinations under the antidumping law may properly result in the creation of classes which do not correspond to [tariff schedule] classifications ... or may define or modify a known classification in a manner not contemplated or desired by the Customs Service." *Id.* [1 CIT] at 87 n. 18, 507 F.Supp. at 1014 n. 18. While harmony between these two agencies would certainly be a felicitous state of affairs, nothing in the Trade Agreements Act requires them to perform their respective functions in lock step. 6 CIT at 160, 572 F.Supp. at 887–88.

The double-gear hub-drive speedometer at issue had not been developed by the time of the original dumping investigation. The ITA had thus employed five criteria in concluding that that merchandise was within the class or kind covered by its order, to wit, (1) the general physical characteristics of the merchandise, (2) the expectations of the ultimate purchasers, (3) the channels of trade in which the merchandise moves, (4) the ultimate use of the merchandise and (5) cost. The court affirmed the agency's reliance on those criteria, in view of the substantial evidence on the record.

▆▆▆ The ITA's final results herein reflect some attempt to apply at least four of the *Diversified Products* criteria to the typewriters at issue.[13] For example, the agency found their general physical characteristics to be "substantially different"[14] from the electro-mechanical PETs subject to the original investigation. However, as set forth above at pages 10–11, in 1983 the ITA determined that portable *electronic* typewriters, which "have taken over"[15], are within the scope of the May 1980 order. As to the other criteria—the uses for which the newest typewriters are being imported, the expectations of their purchasers, the channels of trade in which those machines flow, or their cost—the ITA's published results barely touch upon them. Be that as it may, the defendant now takes the position, *supra* page 287, that "its prior conclusion to the effect that under the criteria established in *Diversified Products* ... PETs incorporating calculators or text memory should be excluded from the scope of the outstanding antidumping duty order ... is not supported by substantial evidence."

The intervenor-defendants contend that the record does contain substantial evidence to support their position(s) on these criteria. However, their papers are replete with carefully-crafted arguments, original-

13. *See* 52 Fed.Reg. at 1,505. In *Kyowa Gas Chemical Industry Co. v. United States*, 7 CIT 311, 312 (1984), [Available on WESTLAW, 1984 WL 3729], the court had stated that
in every scope determination involving a new product, the ITA should examine the product in light of the *Diversified Products* criteria to determine whether the product is of the class or kind of merchandise contemplated by the pertinent antidumping finding.

14. 52 Fed.Reg. at 1,505.

15. To quote from a witness for an erstwhile foreign manufacturer, R.Doc. 343, p. 133. At the hearing on its application for a preliminary injunction, the plaintiff introduced into evidence, without objection, several such machines, in particular, a Brother Compactronic 60 [Ex. 1], a Canon Typest*r 5 [Ex. 3] and a Silver Reed 85EP [Ex. 6]. Also introduced were a Brother Executron 68 [Ex. 2], a Canon Typemate 10 [Ex. 4] and a Silver Reed EX34 [Ex. 5], each of which apparently is at issue herein. Comparison of Exhibit 1 with Exhibit 2, of Exhibit 3 with 4, and of 5 with 6 makes it difficult to conclude that any such pairing physically is substantially (or even less-than-substantially) different.

ly made to the ITA, rather than references to that kind of evidence[16] in the record.

After the defendant had stated its position in support of remand, the court granted the intervenors leave to file replies thereto. As to general physical characteristics, the Brother reply admits:

> ... Outwardly, a portable electronic typewriter, a portable automatic typewriter, and a portable combination calculator/typewriter unit appear physically similar.[17]

Furthermore:

> ... The rapid technological advances in integrated circuits have now enabled devices performing typing, calculating, and data processing functions to be combined in a physically similar exterior package, masking the separate and distinctive functions embedded in the semiconductor chips located inside.[18]

In other words, the differences that exist between the various electronic typewriters are found, most importantly, in the microelectronic circuits which "to the naked, untrained eye ... may all appear similar".[19]

This does not mean that the machines at issue are identical in their physical characteristics, as between themselves or those already deemed covered by the May 1980 order, but they are more similar than dissimilar. Each machine is still dedicated to producing on paper printed letters and other characters as a substitute for handwritten ones through manual use of an electrically-actuated keyboard contained in a unit of such size and weight as to be susceptible to single-hand portage.

The limited evidence in the record tending to support the position of the intervenor-defendants on the uses for which this merchandise is imported, the expectations of the ultimate purchasers, the channels of trade in which the merchandise moves, and cost is thus understandable. That is, the intervenor-defendants have urged this court to carefully review and consider the administrative record. Having now done so, the court is unable to conclude that substantial evidence supports intervenor-defendants' positions on the foregoing criteria. The brief of the Canon intervenor-defendants in further opposition relies primarily on the submissions made in conjunction with the ITA "scope hearing" held in August 1986. The court has reviewed the evidence contained therein, most notably the more than 400 pages comprising R.Doc. 343, and is not persuaded that there are substantial facts to support intervenor-defendants' position. On their part, the Brother intervenor-defendants focus in their reply memorandum not only on the differences in general physical characteristics discussed above, but also on their view of customer expectations/end uses of their products. While their perception of the marketplace for portable typewriters with a rudimentary electronic calculator or an electronic ability to store selected typographic characters may well be correct, they do not show that either capability supplants the traditional expectation that those machines still will be acceptable substitutes for a printing press, rather than a computer or some other, modern marvel.

### III

Notwithstanding defendant's position on remand, it opposes plaintiff's request for suspension of liquidation of the contested typewriters. It is stated that

> the government has sought a remand so that Commerce can make a redetermination of the scope issue based upon substantial evidence in the administrative record. Upon remand, Commerce could well seek additional information and com-

**16.** Substantial evidence has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 459, 95 L.Ed. 456 (1951), quoting from *Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 216, 83 L.Ed. 126 (1938). *See Atlantic Sugar, Ltd. v. United States,* 744 F.2d 1556, 1562 (Fed.Cir. 1984).

**17.** Memorandum of Brother Industries, Ltd. and Brother International Corporation in Opposition to Defendant's Request for Remand, p. 28.

**18.** *Id.* at 29.

**19.** *Id.* at 30.

ments from interested parties before making a redetermination. Consequently, the ultimate decision which Commerce will make upon remand is unknown at this time.[20]

As indicated above, the plaintiff seeks suspension on alternative grounds. Initially, the plaintiff argues (a) that the language and purpose of the trade laws require suspension of liquidation of merchandise potentially covered by an antidumping-duty order pending a ruling on the scope of the order, (b) that agency precedent requires suspension and (c) that the ITA has authority to suspend liquidation.[21] As to this last point, the plaintiff relies on the statement in the *Diversified Products* opinion that "it is the ITA which directs Customs to assess antidumping duties on given classes or kinds of merchandise"[22] and argues that the "necessary corollary" is the authority to suspend liquidation of entries, citing *United States v. Bailey*, 34 U.S. (9 Pet.) 238, 255, 9 L.Ed. 113 (1835) ("where the end is required, the appropriate means are given").[23] Notably, the plaintiff does not cite any part of either the Trade Agreements Act of 1979 or the Trade and Tariff Act of 1984. Indeed, the provision for imposition of antidumping duties if the administering authority determines that a class or kind of foreign merchandise is being sold in the United States at less than fair value, 19 U.S.C. § 1673 (1984), is silent on the subject of suspension of liquidation. Rather, under the statute now in effect suspension is mandated after either a preliminary or a final affirmative determination of the ITA of sales at less than fair value of the merchandise which is the subject of its investigation. *See* 19 U.S.C. § 1673b(d) and § 1673d(c)(1)(B). Neither such affirmative determination as to the typewriters in question has been made by the administering authority.

■ Nevertheless, the plaintiff has produced a copy of a telex dated July 12, 1985 from the agency to the Customs Service requesting suspension of liquidation on entries of some 31 named typewriters "which may or may not be subject to the [May 1980] order." At a minimum, a number are among those contested by the parties. However, the issuance of this request or similar ones in other proceedings does not mean that, as the plaintiff argues, the ITA was "required" to do so.

Secondarily, the plaintiff presses its application for a preliminary injunction. Defendant's statement in opposition quoted above, page 17, is contained in argumentation on whether the plaintiff has satisfied the likelihood-of-success-on-the-merits requirement set forth in *S.J. Stile Associates Ltd. v. Snyder*, 68 CCPA 27, 30, C.A.D. 1261, 646 F.2d 522, 525 (1981), and in myriad other cases for grant of injunctive relief.[24]

Obviously, counsel for the defendant seek to preserve administrative prerogatives on any remand. On the other hand, the plaintiff has projected success on the scope issue on the record presently before the court since the making of its present application.

This and other courts have held that although the

> extraordinary remedy of a preliminary injunction is not available unless the moving party's burden of persuasion is met as to all four of the above factors, the showing of likelihood of success on the merits is in inverse proportion to the severity of the injury the moving party will sustain without injunctive relief.

---

**20.** Defendant's Memorandum in Opposition to the Application of Plaintiff, Smith Corona Corporation, for Preliminary Injunction, p. 22.

**21.** *See* Memorandum of Points and Authorities in Support of Plaintiff's Show Cause Motion and Alternative Motion for Injunctive Relief, pp. 11–20.

**22.** 6 CIT at 159, 572 F.Supp. at 887.

**23.** *Supra* note 20, p. 20.

**24.** The other three, traditional criteria for such relief, to quote from *S.J. Stile*, are:

> ... (1) A threat of immediate irreparable harm; (2) that the public interest would be better served by issuing than by denying the injunction; ... and (4) that the balance of hardship on the parties favored [the applicant].

*Hyundai Pipe Co. v. U.S. Department of Commerce*, 11 CIT ——, Slip Op. 87–39 at 10 (April 1, 1987) [Available on WESTLAW, 1987 WL 8807]. *See, e.g., Ceramica Regiomontana, S.A. v. United States*, 7 CIT 390, 395, 590 F.Supp. 1260, 1264 (1984); *American Air Parcel Forwarding Company v. United States*, 1 CIT 293, 300, 515 F.Supp. 47, 53 (1981). Nevertheless, in *Bomont Industries v. United States*, 10 CIT ——, 638 F.Supp. 1334 (1986), the court denied an application for a preliminary injunction, which was based essentially upon a plea that failure to suspend liquidation of the contested imports would cause irreparable harm, because the plaintiff failed to bear its burden of showing that such harm would be caused by nonimposition of an antidumping duty on any liquidations of those imports prior to final judgment. The plaintiff has the same burden herein.

■ To support its position, the plaintiff has submitted two affidavits from its president, G. Lee Thompson. In the first, he states his opinion [para. 5] that

> one reason for the rapid penetration of the U.S. market by Panasonic typewriters is the fact that its portable models have circumvented the antidumping duty order by the addition of calculating devices and text memory . . .

and that [para. 13]

> pricing trends for models not deemed covered by the existing antidumping order can only occur through dumping. . . .

The remainder of the affidavit, however, is short on facts tending to support these views. But even if it were not, Mr. Thompson does not attempt to equate them with the issue plaintiff's application raises.

That is, he does not show how failure to liquidate outstanding entries of foreign competitors [25] at rates including antidumping duties based on margins he himself characterizes as "small or de minimis" [26] already found for certain competitive models would cause his firm irreparable harm.

Indeed, Mr. Thompson's second affidavit underscores the fact that *"Smith Corona has generated profits in 1986 and 1987 (year to date) on its total product line"*.[27] This point is emphasized in the context of claimed "massive losses incurred in prior years" albeit "following the issuance of the antidumping duty order." [28] The affiant's perspective, at least as reflected in this paragraph, seems to be that the harm of past losses is somehow reparable through the law aimed at unfair trade practices, most immediately through an injunction suspending liquidation of present and future entries pending remand for further administrative action.

The purpose of that interim remedy, however, is maintenance of the status quo and the prevention of irreparable harm in the future, not the correction of past, perceived injustices. Here, of course, as the intervenor-defendants correctly point out, the status quo is that the typewriters at issue have not been determined to be within the ambit of the May 1980 order.

The plaintiff has produced Commerce Department data detailing a decline in imports of typewriters without text memories and an increase in machines with such electronic memories. The plaintiff has also produced price lists alleged to be for Brother machines this year. The numbers thereon do indicate certain price reductions since

**25.** Under 19 U.S.C. § 1504, the Customs Service has at least a year's time in which to liquidate any entries.

**26.** Affidavit of G. Lee Thompson, para. 9, p. 4 (Oct. 30, 1987).

**27.** Second Affidavit of G. Lee Thompson, para. 6, p. 3 (Nov. 15, 1987) (emphasis in original). An officer of plaintiff's domestic parent company is reported to have characterized this as an "absolutely fabulous, fabulous turn-around story". *Smith–Corona Is Typing in Black Ink Again,* June 9, 1986 Bus. Wk., p. 70, col. 3. An interim report of plaintiff's foreign parent organization for 1987 indicates that Smith–Corona profit is "well ahead of last year's record pace as productivity increases." A recent Wall Street Journal article [Sept. 30, 1987, p. 25, col. 2] stated that production was running at 5,000 typewriters a day, "up sharply from 1,500 a day in early 1985", and a more recent New York Times reports plaintiff's vice-president for marketing to have indicated that the company now has close to 50 percent of the typewriter business in the United States. Nov. 5, 1987, p. D24, col. 3.

**28.** Second Thompson Affidavit, para. 6, p. 3.

June 1, 1987 [29], but it is not clear how suspension of liquidation of the merchandise being offered thereunder would prevent the competitive harm the plaintiff perceives, especially if the 2.24 percent dumping margin determined for the earlier Brother models originally covered by the May 1980 order were to be sustained upon judicial review herein. Then again, during oral argument on plaintiff's application, its counsel claimed not to desire any cash deposits if a preliminary injunction were to be granted. *See* Transcript, p. 93.

As stated above, page 4, the court has enjoined liquidation of those PET entries at issue in counts 1–7 of the amended complaint. That relief was granted essentially on the basis of *Zenith Radio Corporation v. United States*, 710 F.2d 806, 810 (Fed. Cir.1983), wherein the court concluded

> that liquidation would ... eliminate the only remedy available to Zenith for an incorrect review determination by depriving the trial court of the ability to assess dumping duties on Zenith's competitors in accordance with a correct margin on entries in the '79–'80 review period. The result of liquidating the '79–'80 entries would not be economic only. In this case, Zenith's statutory right to obtain judicial review of the determination would be without meaning for the only entries permanently affected by that determination. In the context of Congressional intent in passing the Trade Agreements Act of 1979 and the existing finding of injury to the industry underlying T.D. 71–76, we conclude that the consequences of liquidation do constitute irreparable injury.

However, both that case and counts 1–7 of this action arose out of a review of a fixed period pursuant to section 751 of the 1979 act, 19 U.S.C. § 1675. That, of course, is not true of the newer typewriters now at issue.

In *Bomont Industries v. United States, supra*, this court held that the decision in *Zenith* did not create an irrebuttable presumption of irreparable harm in an action such as this where suspension is sought for future liquidations. The court relied on *American Spring Wire Corp. v. United States*, 7 CIT 2, 578 F.Supp. 1405 (1984), and also cited *Timken Company v. United States*, 6 CIT 75, 569 F.Supp. 65 (1983).

The plaintiff relies heavily on *Timken*, which apparently is the only case in which a preliminary injunction was granted, suspending liquidations for entries beyond the period of the administrative review at issue. That is, originally the court denied such relief in *Timken Company v. United States*, 4 CIT 263, 553 F.Supp. 1060 (1982). Thereafter, the court of appeals decided *Zenith*, whereupon Timken moved for a rehearing of its application. Its action involved a challenge to an annual review pursuant to section 1675 which had resulted in an administrative revocation of the antidumping duty order in contrast to *Zenith*, where the issue simply was the appropriate margin for such duty on a year's entries. The court's opinion in *Timken*, 6 CIT at 80, 569 F.Supp. at 69, refers to some 121 entries unliquidated during the review period up to the revocation date plus 14 made thereafter. In granting the injunction, the court equated the obverse with loss of jurisdiction, which, of course, is the underlying rationale of *Zenith*.

Loss of jurisdiction over this action is not the point. The typewriters now in question were not an issue in 1981–82, the period of administrative review, the results of which are challenged in this bifurcated action. Almost five years later, the ITA ruled them out of its proceeding. A successful challenge to this determination would result in prospective relief, and the plaintiff "retains both its statutory right and a remedy which may be pursued". *Timken Company v. United States*, 11 CIT ——, 666 F.Supp. 1558, 1560 (1987). Moreover, there is no showing that any liquidation of entries during the time required for reconsideration will cause the plaintiff irreparable harm. *See id.*

This and other courts have held that failure of an applicant to bear its burden of persuasion on irreparable harm is ground

---

**29.** *Compare id.*, Exhibit 3 *with id.*, Confidential Exhibit 5.

to deny a preliminary injunction. *E.g., Bomont Industries, Inc. v. United States*, 10 CIT at ——, 638 F.Supp. at 1340; *National Corn Growers Association v. Baker*, 9 CIT 571, 585, 623 F.Supp. 1262, 1275 (1985); *American Air Parcel Forwarding Company v. United States*, 6 CIT 146, 152, 573 F.Supp. 117, 122 (1983). However, were this not the rule, the court could not find in plaintiff's favor on the remaining two criteria for such extraordinary relief, either the public interest's being better served by issuance thereof or the balance of hardship's favoring the plaintiff. In fact, neither Thompson affidavit presents any evidence in support of its position on these grounds. *Cf. Hyundai Pipe Co. v. U.S. International Trade Commission*, 10 CIT ——, ——, 650 F.Supp. 174, 176 (1986) (an applicant for a preliminary injunction has a "heavy burden of producing evidence").

*Conclusion*

In view of the foregoing, the motion of the Brother intervenor-defendants to dismiss counts 8–10 of the complaint on the ground of lack of subject-matter jurisdiction must be, and it hereby is, denied. Plaintiff's application for a preliminary injunction suspending liquidation must also be, and it hereby is, denied. On the other hand, plaintiff's motion for partial judgment on the agency record must be, and it hereby is, granted, and that part of this action which is based on counts 8–10 of the amended complaint is hereby remanded to the International Trade Administration for reconsideration of its determination and publication of a revised determination as to whether or not portable electric typewriters incorporating calculators or text memory are within the scope of the May 9, 1980 antidumping-duty order. That revised determination shall be published within 45 days of the date hereof.

So ordered.