**MAKITA CORPORATION, Makita U.S.A., Inc., and Makita Corporation of America, Plaintiffs,**

v.

**UNITED STATES of America, and United States Department of Commerce, Defendants.**

**Court No. 93–02–00114.**

United States Court of International Trade.

April 1, 1993.

Verner, Liipfert, Bernhard, McPherson and Hand, Chartered, Kathleen H. Hatfield, Washington, DC, for plaintiffs.

Stuart E. Schiffer, Acting Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Jeffrey M. Telep, Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Linda Andros, Washington, DC, of counsel, for defendants.

## OPINION & ORDER

AQUILINO, Judge:

This is another case which raises issues of unusual sensitivity, including the propriety of judicial intervention in on-going administrative proceedings, protection of confidential information, effective assistance of counsel in the absence of access to such information and the interaction of attorneys in zealously representing the competing interests of the clients, to quote from *Hyundai Pipe Co. v. U.S. Dep't of Commerce,* 11 CIT 238, 1987 WL 8807 (1987).

### I

In its notice of *Initiation of Antidumping Duty Investigations; Professional Electric Cutting Tools and Professional Electric Sanding/Grinding Tools,* 57 Fed.Reg. 28,483 (June 25, 1992), the International Trade Administration, U.S. Department of Commerce ("ITA") stated that it was commencing the proceedings based on a petition filed on behalf of Black & Decker (U.S.) Inc. At that time, the petitioner was represented by the law firm Dorsey & Whitney, which filed with the ITA a form application for administrative protective order signed July 9, 1992 by three lawyers with that firm and two other individuals. The application was granted on July 28, 1992, whereupon Dorsey & Whitney applied to amend the protective order to include another attorney associated with the firm, Panagiotis C. Bayz. That application (of July 30, 1992), however, bore a copy of a written objection by an attorney for the primary focus of the ITA nascent investigations, Makita Corporation, to inclusion of Mr. Bayz

under the protective order on the ground that he had

had a significant and substantial involvement in a Section 337 case Makita had brought before the ITC in 1988–1989. At that time he was working for Makita, and became privy to Makita's sensitive financial and marketing data.[1]

Before the ITA acted on the request for amendment, signatories of the July 9, 1992 application left Dorsey & Whitney for the law firm Stroock & Stroock & Lavan, along with Mr. Bayz and their client Black & Decker. A new application for a protective order was submitted and granted, followed by another request for inclusion of the firm's new associate.

On February 17, 1993, after more than six months of repeated opposition by Makita, the ITA determined to grant Mr. Bayz access to the confidential information submitted by that respondent corporation per the following reasoning:

It is clear from the submissions of both parties that Mr. Bayz did have some prior legal involvement with a Section 337 action on behalf of Makita. However, the fact that Mr. Bayz worked on such a matter at various times in the past, and at various levels in his legal maturation, has no bearing as to whether or not he is entitled to an APO under our regulations for the current AD investigation, which involves 1991–92 less than fair value sales allegations. Section 777 of the Tariff Act of 1930 and Department regulations circumscribe the bounds of our jurisdiction. Section 777(C)(1)(A) mandates that the Department ... "shall make ... available all business proprietary information ... to all interested parties who are parties to the proceeding under a protective order ...". Our regulatory procedures set out how and when a party is entitled to business proprietary information and are concerned with ensuring that parties who gain APOs do not directly, or even inadvertently, disseminate, or in any manner disclose such information to others who are not so entitled. Our application Form ITA–367 (3.89) sets out the limited circumstances that we

inquire into when determining whether to grant APO status. The questions are concerned with particular relationships, present and future, that the person applying may have with interested parties to the current proceeding pending before the Department. Where a person currently holds, or will hold, a decision making position in a company that is a party to the proceeding (eg., in-house counsel[)], or holds, or will hold such a position in the company of a competitor of a party(s) to the proceeding, then the Department may determine not to grant APO status under these circumstances. Again, this will be a limited decision for the sole purpose of determining if the relationship in question would compromise proprietary information to be released under APO, now or in the future.

Additionally, whether or not a 337 action is substantially related to the current AD investigation before the Department is not relevant to the inquiry we must make before granting APO status, nor is it relevant that Bayz may have information concerning Makita's past Section 337 action, which might now assist or give some advantage to petitioner or its counsel in this pending investigation. Since the Department has no jurisdiction over parties to a 337 action it can not make findings regarding information submitted in that matter. Rather, the Department has limited jurisdiction to determine who may receive APO status in antidumping or countervailing duty proceedings based upon the current and future relationships of those requesting an APO with those parties that have submitted business proprietary information in a current proceeding. Therefore, the Department takes no position regarding actual or potential breaches of conflict of interest and/or attorney-client privilege by Bayz, and we do not deem it a matter that is within our provence to decide upon.

Rather, such allegations would seem to be more appropriately decided by the Bar in which Bayz is a member, or in some other forum which has jurisdiction over such matters....

---

1. Letter of William A. Zeitler to James Taylor, p. 1 (July 29, 1992).

... Mr. Bayz has provided all of the information required by the Department in his applications for protective order, FORM ITA-367 (3.89). Moreover, it is the Department's general policy not to interfere in a party's choice of representation.

This decision concluded by warning that the respondent(s) had two business days within which to withdraw any

information Makita does not want to release to Mr. Bayz. Any information withdrawn will not be considered in this proceeding and may result in the use of the best information available for the Department's final determination.

## II

This case then commenced, and, after immediate oral argument from both sides on plaintiffs' proposed order to show cause, the court granted a temporary restraining order, pending formal response by the defendants and a full hearing on plaintiffs' application for a preliminary injunction. Such a hearing has been held, at the conclusion of which the defendants consented to extension of the restraining order until this decision.

## A

In 1988, Makita U.S.A., Inc. and Makita Corporation of America filed a complaint with the U.S. International Trade Commission ("ITC"), alleging unfair methods of competition and unfair acts in the importation of articles into the United States within the meaning of 19 U.S.C. § 1337. *See Certain Electric Power Tools, Battery Cartridges and Battery Chargers,* 53 Fed.Reg. 31,112 (Aug. 17, 1988). Counsel for the complainants were Bell, Boyd & Lloyd, who had had Panagiotis C. Bayz in their employ as a paralegal since May 1986.

According to an affidavit submitted in the matter now before the ITA by Mr. Bayz, he began law school in August 1988, subsequent to which he was a "part-time law clerk with Bell, Boyd & Lloyd from January 1989 to April 1990 and ... a summer associate from May to July, 1989." He states that, during those months at the firm, he worked with William A. Zeitler and other attorneys on the section 1337 complaint filed by Makita. An affidavit provided to the court in this case by Mr. Zeitler adds:

4. I was lead counsel for Makita in the Section 337 proceeding. As such, I was aware of Mr. ... Bayz's activities on behalf of Makita in his various capacities as paralegal, law clerk, and summer associate at Bell, Boyd & Lloyd.

5. Mr. Bayz spent a significant portion of his time at Bell, Boyd & Lloyd on Makita matters. I recall Mr. Bayz having meetings with me about pricing comparisons of Makita's and competitors' products that I had requested him to do. Also, there were deposition digests I asked him to prepare, and Makita documents that I asked him to review. Mr. Bayz also had input into a large number of the pleadings, or portions of the pleadings, in the Section 337 proceeding. This included the appeal to the Federal Circuit, large parts of which were filed under seal.

6. As a part of the Section 337 proceeding, Makita produced thousands (at least 80,000) of documents, most of which were submitted under the ITC protective order. Mr. Bayz had access to these for his legal tasks. These documents contained confidential information regarding Makita's competition, Makita's distribution practices, its pricing practices, operations and sales figures. Mr. Bayz also had access to information relating to the similarities/differences between Makita's various tools and Makita's marketing practices.

7. In addition, Mr. Bayz had access to sensitive production data at Makita's production facilities at Buford, GA., as well as profit and loss statements for Makita Corp., Makita USA, Inc. and Makita Corporation of America.

8. Mr. Bayz assisted Makita in compiling, and had access to, the confidential data underlying Makita's submission in the Section 301 retaliatory tariff proceeding in 1987 where Black & Decker, the petitioner in the current antidumping investigation, was urging the imposition of 100% retaliatory tariffs on Makita's tools.

Mr. Zeitler supplemented this affidavit with testimony at the hearing in open court.[2]

On their part, the defendants have interposed an answer to the complaint, which concedes, among other things, that the court is possessed of jurisdiction over this case [3]— pursuant to 28 U.S.C. § 1581(i). *See Hyundai Pipe Co. v. U.S. Dep't of Commerce*, 11 CIT at 242; *Sacilor, Acieries et Laminoirs de Lorraine v. United States*, 3 CIT 191, 542 F.Supp. 1020 (1982); *Arbed, S.A. v. United States*, 4 CIT 132, 1982 WL 2260 (1982). The defendants have also served and filed a motion styled as to dismiss pursuant to CIT Rule 12(b)(5). However, the prior joinder of issue via their answer, combined with matters presented outside the pleadings by the plaintiffs, make defendants' motion one for summary judgment in accordance with CIT Rule 12(c).

The motion takes the position that (1) the applicable statute, regulations and case law mandate Commerce to disclose business proprietary information under administrative protective order; (2) the plaintiffs have failed to allege that their business proprietary information fulfills one of the exceptions set forth in the statute; (3) the ITA properly decided to release Makita's business proprietary information to Mr. Bayz; and (4) the regulatory safeguards are sufficient to deter him from violating the administrative protective order.[4]

## B

■ Of course, the defendants are correct to emphasize that the law mandates that the ITA disclose business proprietary information under administrative protective order, and that occurred expeditiously in this matter. In fact, not only were the initial five signatories of the Dorsey & Whitney application granted access, but also one law clerk, two legal assistants, four legal secretaries, one documents clerk and one messenger, for a total of 14 persons. The statute under which such access was granted, 19 U.S.C. § 1677f(c)(1)(A), provides, in general, that:

> Upon receipt of an application ... which describes in general terms the information requested and sets forth the reasons for the request, the administering authority ... shall make all business proprietary information presented to, or obtained by it, during a proceeding (except privileged information, classified information, and specific information of a type for which there is a clear and compelling need to withhold from disclosure) available to interested parties who are parties to the proceeding under a protective order described in subparagraph (B), regardless of when the information is submitted during a proceeding....

The specified exceptions to disclosure "are intended to be very narrow and limited" [5] for the statute favors production.

As quoted above, the ITA concluded that the application(s) on behalf of Mr. Bayz did not implicate any of the three exceptions, characterizing its decision as "limited ... for the sole purpose of determining if the relationship in question would compromise proprietary information to be released under APO, now or in the future." In other words, the agency believes it has "limited jurisdiction" and therefore

> takes no position regarding actual or potential breaches of conflict of interest and/or attorney-client privilege by Bayz, and we do not deem it a matter that is within our province to decide upon.

> Rather, such allegations would seem to be more appropriately decided by the Bar in which Bayz is a member, or in some other forum which has jurisdiction over such matters.

## C

This is a forum which has jurisdiction over

---

2. The court's temporary restraining order required timely service of a copy thereof on Stroock & Stroock & Lavan. No one from that firm was thereafter in attendance at the hearing.

3. The complaint alleges jurisdiction pursuant to 28 U.S.C. §§ 1581(f) and 1585.

4. *See generally* Defendants' Memorandum in Support of its [*sic*] Motion to Dismiss and in Opposition to Plaintiffs' Motion for a Preliminary Injunction, pp. 9–21.

5. H.R.Rep. No. 576, 100th Cong., 2d Sess. 623 (1988).

such matters.[6] Panagiotis C. Bayz is a member of the Bar of this Court of International Trade, which has plenary authority and responsibility to supervise professional conduct. *See generally Nat'l Bonded Warehouse Ass'n, Inc. v. United States,* 13 CIT 590, 718 F.Supp. 967 (1989). *See also* 28 U.S.C. § 1585 (the Court of International Trade possesses "all the powers in law and equity of, or as conferred by statute upon, a district court of the United States"); *Trone v. Smith,* 621 F.2d 994, 999 (9th Cir.1980); *Richardson v. Hamilton Int'l Corp.,* 469 F.2d 1382, 1385–86 (3d Cir.1972), *cert. denied,* 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973). The plaintiffs argue that there is a clear and compelling need to withhold disclosure, "not because plaintiffs fear Mr. Bayz would divulge information to persons not covered by the APO, but because he comes to the APO already disqualified under case law and the ethical canons governing the legal profession."[7] Indeed, when Makita first objected last summer, Dorsey & Whitney sought to rely on section 1.9 of the District of Columbia Rules of Professional Conduct[8]. ABA Model Rule of Professional Conduct 1.9 parallels that section, providing *in toto* under the rubric Conflict of Interest: Former Client:

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client consents after consultation.

(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client whose interests are materially adverse to that person and about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter, unless the former client consents after consultation.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

(1) use information relating to the representation to the disadvantage of the former client except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client or when the information has become generally known; or

(2) reveal information relating to the representation except as Rule 1.6 or Rule 3.3 would permit or require with respect to a client.

Although the Model Rules are for lawyers, nonlawyers are also under an obligation not to compromise the legal representation of the clients of firms in which they work. For example, Model Rule 5.3 imposes a duty on a supervising attorney to ensure that nonlawyers' conduct is compatible with the professional obligations of lawyers. Where nonlawyers have had access to confidential information and subsequently change firms, courts have held them to the same standards of Rule 1.9. *E.g., Williams v. Trans World Airlines,* 588 F.Supp. 1037, 1044 (W.D.Mo.1984):

... If information provided by a client in confidence to an attorney for the purpose of obtaining legal advice could be used against the client because a member of the attorney's non-lawyer support staff left the attorney's employment, it would have devastating effect both on the free flow of information between client and attorney and on the cost and quality of the legal services rendered by an attorney. Every departing secretary, investigator, or paralegal would be free to impart confidential information to the opposition without effec-

---

**6.** The defendants take the position that jurisdiction is predicated upon 28 U.S.C. § 1581(i), thereby making this civil action one not specified in subsections (a) through (c) of 28 U.S.C. § 2640. In such cases, subsection (d) thereof provides for review as provided in 5 U.S.C. § 706.

**7.** Plaintiffs' Memorandum in Opposition to Defendants' Motion to Dismiss, p. 9.

**8.** According to the firm's APO application, Mr. Bayz is also admitted to the practice of law in the District of Columbia and in the state of Maryland.

tive restraint. The only practical way to assure that this will not happen and to preserve public trust in the scrupulous administration of justice is to subject these "agents" of lawyers to the same disability lawyers have when they leave legal employment with confidential information.

A difference, however, is that, rather than disqualify an entire firm when a member would represent the other side of a substantially-related matter, a nonlawyer can generally be screened from working on that side. *See, e.g.,* ABA informal opinion 88–1526; *Kapco Manufacturing Co. v. C & O Enterprises, Inc.,* 637 F.Supp. 1231 (N.D.Ill.1985).

■ As to whether a matter is substantially-related or not, *T.C. Theatre Corp. v. Warner Bros. Pictures,* 113 F.Supp. 265 (S.D.N.Y.), *reh'g denied,* 125 F.Supp. 233 (S.D.N.Y.1953), originally articulated the test as follows:

> A lawyer's duty of absolute loyalty to his client's interests does not end with his retainer. He is enjoined for all time, except as he may be released by law, from disclosing matters revealed to him by reason of the confidential relationship. Related to this principle is the rule that where any substantial relationship can be shown between the subject matter of a former representation and that of a subsequent adverse representation, the latter will be prohibited.
>
> \* \* \* \* \* \*
>
> ... [T]he former client need show no more than that the matters embraced within the pending suit wherein his former attorney appears on behalf of his adversary are substantially related to the matters or cause of action wherein the attorney previously represented him, the former client. The Court will assume that during the course of the former representation confidences were disclosed to the attorney bearing on the subject matter of the representation. It will not inquire into their nature and extent. Only in this manner

can the lawyer's duty of absolute fidelity be enforced and the spirit of the rule relating to privileged communications be maintained.

*Id.* at 268–69 (footnotes omitted). This approach has been refined in the Second Circuit, for example, so that an attorney may be disqualified from representing a client in a particular case if

> (1) the moving party is a former client of the adverse party's counsel;
>
> (2) there is a substantial relationship between the subject matter of the counsel's prior representation of the moving party and the issues in the present lawsuit; and
>
> (3) the attorney whose disqualification is sought had access to, or was likely to have had access to, relevant privileged information in the course of his prior representation of the client.

*Evans v. Artek Systems Corp.,* 715 F.2d 788, 791 (2d Cir.1983), citing *Cheng v. GAF Corp.,* 631 F.2d 1052, 1055–56 (2d Cir.1980), *judgment vacated on other grounds,* 450 U.S. 903, 101 S.Ct. 1338, 67 L.Ed.2d 327 (1981), and *Emle Industries, Inc. v. Patentex, Inc.,* 478 F.2d 562, 570–71 (2d Cir.1973).

■ In the case at bar, Makita is the client of Mr. Bayz's former supervising attorney and seeks to prevent his proceeding now against its interests. The record reveals that Mr. Bayz had access to sensitive Makita business proprietary information which it wishes to continue to protect.[9] As for the other element of disqualification, courts have shown concern for a client's right to counsel of choice and also for the complications which can develop in litigation when disqualification occurs. *See, e.g., Gov't of India v. Cook Industries, Inc.,* 569 F.2d 737 (2d Cir.1978). Here, however, petitioner Black & Decker is apparently ably represented; it has not sought to express any views or to take any position in this case, and the defendants indicated at the hearing that the continuing non-access of Mr. Bayz, some six months of which

---

9. The court notes in passing that, if some 80,000 documents were produced by Makita in the section 1337 investigation, it may be "humanly impossible to control the inadvertent disclosure of some of this information in any prolonged working relationship." *U.S. Steel Corp. v. United States,* 730 F.2d 1465, 1467 (Fed.Cir.1984), quoting from the opinion of the court below, 6 CIT 55, 57, 569 F.Supp. 870, 872 (1983).

is the responsibility of the ITA itself[10], has not impeded the progress of the agency investigations.[11]

Suffice it to state on the record presented that the question is simply whether or not Mr. Bayz's participation in the proceedings brought by Black & Decker would be substantially-related to his earlier participation on behalf of Makita.

On this point, counsel for the plaintiffs argue now that the respondents in the

> Section 337 case focused heavily on an extensive analysis of Makita's pricing, profit and loss, marketing, sales and financial data. They were also concerned with Makita's corporate structure, production processes, product characteristics and its U.S. distributors and customers. Thus, the Section 337 case addressed the very same matters (pricing and sales practices, distribution and retailing practices, accounting and marketing practices, product development and corporate strategy), which are key to the current antidumping investigation.

Plaintiffs' Memorandum, p. 5. This position finds support in the published reports of the ITC to date on both proceedings. *Compare* USITC Pub. 2389 (June 1991) *with* USITC Pub. 2536 (July 1992).

The plaintiffs also argue that both sections of the Tariff Act of 1930, as amended, 1337 and 1673 of Title 19, U.S.C., provide a remedy for the differential pricing which results from anticompetitive conduct of foreign manufacturers and exporters and also that a complainant or petitioner be part of ' domestic, U.S. industry suffering injury as a result of that conduct. The plaintiffs point out that (1) market penetration by imports, (2) lost sales, (3) decreases in production, (4) decreases in sales, (5) reduction in profitability, (6) decreases in employment in the affected

industry, (7) lower prices of the imports, (8) production capacity of the respondent in the foreign country and (9) intent to penetrate the U.S. market are all factors in an injury determination under section 1337, while (1) volume of market penetration by imports, (2) effect of the imports on prices, (3) impact of imports on operations of domestic producers, (4) price underselling, (5) price suppression, (6) decreases in production, (7) decreases in sales, (8) decreases in employment in the affected industry and (9) production capacity in the foreign country are all factors for determining material injury due to dumping.

In fact, subsection (b)(3) of 19 U.S.C. § 1337 contemplates that issues raised under that section can be determined to be so related to matters within the purview of 1673 as to curtail investigation under 1337.[12] That did not happen with regard to Makita, but this circumstance does not color the court's consideration of the conflict-of-interest issue, which focuses on the situation of the lawyer rather than on that of an agency under the statute.

With regard to Mr. Bayz and his actual involvement in the proceedings on behalf of Makita pursuant to section 1337, as contrasted with the predictable involvement by him on behalf of Black & Decker under section 1673, this court cannot conclude from the record at hand that those involvements would be substantially unrelated. On the contrary, the latter would appear to be necessarily related to plaintiffs' business practices and data, which were at the core of Mr. Bayz's former confidential involvement.

If, on the other hand, the opposite conclusion were indicated, any participation in the ITA investigations by Mr. Bayz would be constricted by the prior ITC section 1337 protective order.[13] And ABA Model Rule of Professional Conduct 1.7(b) provides that a

10. *Cf.* 19 U.S.C. § 1677f(c)(1)(C), which provides that the agency determine whether to make information available not later than 30 days after the date submitted.

11. Witness the ITA preliminary determinations of Makita sales at less than fair value, 58 Fed.Reg. 81–84 (Jan. 4, 1993).

12. Moreover, affirmative results of ITA investigations of alleged dumping require the ITC to then

make determinations as to material injury or threats thereof. This has transpired herein. *See Professional Electric Cutting and Sanding/Grinding Tools From Japan*, ITC Inv. No. 731–TA–571 (Final), 58 Fed.Reg. 6,975 (Feb. 3, 1993).

13. *Compare* 19 C.F.R. § 210.37(c), the regulation governing violation of an ITC protective order, *with* 19 C.F.R. § 201.15(a) ("Any attorney or agent practicing before the Commission ... may

lawyer shall not represent a client if the representation of that client may be materially limited by the lawyer's responsibilities to another client or to a third person, or by the lawyer's own interests, unless:

(1) the lawyer reasonably believes the representation will not be adversely affected; and

(2) the client consents after consultation. . . .

In short, if Mr. Bayz were to participate in the antidumping proceedings on Black & Decker's behalf, while still subject to constraints arising out of the section 1337 investigation, he would be unable to give his complete best efforts on behalf of Black & Decker. In this regard, the court in *Trone v. Smith* stated, 621 F.2d at 998–99:

Both the lawyer and the client should expect that the lawyer will use every skill, expend every energy, and tap every legitimate resource in the exercise of independent professional judgment on behalf of the client and in undertaking representation on the client's behalf. That professional commitment is not furthered, but endangered, if the possibility exists that the lawyer will change sides later in a substantially related matter. Both the fact and the appearance of total professional commitment are endangered by adverse representation in related cases. From this standpoint it matters not whether confidences were in fact imparted to the lawyer by the client. The substantial relationship between the two representations is itself sufficient to disqualify.

**D**

To summarize the preceding part C of this opinion, the plaintiffs have persuaded the court of the likelihood of their success on the merits, but grant of an application for preliminary injunctive relief also requires a showing of a threat of immediate irreparable harm, that the public interest would be better served by issuing rather than by denying an injunction, and a balance of hardship in the applicant's favor. *E.g., S.J. Stile Associates Ltd. v. Snyder,* 68 CCPA 27, 30, C.A.D. 1261,

646 F.2d 522, 525 (1981); *Federal–Mogul Corporation v. United States,* 16 CIT —, —, 808 F.Supp. 839, 840 (1992).

Neither in their papers in opposition nor at the hearing have the defendants shown a balance tipped in their favor on the latter two grounds. This is doubtless true for several reasons: The real party in interest, be it petitioner Black & Decker or its counsel Stroock & Stroock & Lavan or their associate Panagiotis C. Bayz, is not before the court. By way of comparison, in a matter in which the ITA had denied access under protective order to an attorney chosen by the subject of an antidumping-duty administrative review, the agency did not defend its decision on judicial review in the Court of International Trade, only the prevailing party in interest, which intervened in opposition to that subject's complaint. *See Ornatube Enterprise Co. v. United States,* 17 CIT —, Slip Op. 93–29, 1993 WL 74002 (March 10, 1993). Whatever the role of the government in the proceedings at bar, the participation or nonparticipation of Mr. Bayz in them does not portend any harm to the ITA or its weighty responsibilities, but the same cannot be said of the plaintiff subjects of the agency's investigations. As for the public, its interest therein is the fair and efficient administration of U.S. trade laws, as well as the appearance of such administration in the eyes of all who come within their realm. Clearly, that interest would not be enhanced by dismissing this case summarily per defendants' motion.

■ In *Hyundai Pipe Co.,* this court held that, not only is the revelation of a secret an irrevocable act, any rights of a party injured by either advertent or inadvertent use of confidential information could not redress that particular, irreparable harm. 11 CIT at 243, citing *A. Hirsh, Inc. v. United States,* 11 CIT 208, 211, 657 F.Supp. 1297, 1300 (1987), and *Akzo N.V. v. U.S. Int'l Trade Comm'n,* 808 F.2d 1471, 1483 (Fed.Cir.1986), *cert. denied,* 482 U.S. 909, 107 S.Ct. 2490, 96 L.Ed.2d 382 (1987). Of course, unlike those cases, disclosure is not quite the point here.

for good cause shown be suspended or barred from practicing before the Commission, or have

imposed on him such lesser sanctions as the Commission deems appropriate").

According to the plaintiffs, they have already shared much inside information with Mr. Bayz while in their employ. Mr. Zeitler testifies to that employment in a wholly-complimentary fashion, so much so that his clients claim fear of unfair advantage if their adversary Black & Decker is at liberty to avail itself of Mr. Bayz's accumulated knowledge. Whatever has already happened independent of these proceedings, this case requires the court to look to the present and the future, and, from this perspective, it cannot be said with certainty that any taking of unfair advantage could be remedied *ex post facto*. Ergo, the plaintiffs are confronted with the threat of irreparable harm. Moreover, this and other courts have held that the severity of the injury the moving party will sustain without injunctive relief is in inverse proportion to the showing of likelihood of success on the merits. *See Smith Corona Corp. v. United States*, 11 CIT 954, 965, 678 F.Supp. 285, 293 (1987); *Ceramica Regiomontana, S.A. v. United States*, 7 CIT 390, 395, 590 F.Supp. 1260, 1264 (1984); and *American Air Parcel Forwarding Co. v. United States*, 1 CIT 293, 300, 515 F.Supp. 47, 53 (1981).

### III

 Clearly, the foregoing discussion indicates continuing injunctive relief. This leads to consideration of the appropriate nature thereof in the absence of the real adverse party or parties in interest. Since only the ITA is properly before the court, relief can only be granted as against it.

That agency considers itself without authority to forestall a conflict of interest other than to offer the plaintiffs a choice comparable to that of Thomas Hobson, to wit, agree that your former confidant assist your adversary in a substantially-related manner against you or withdraw your inside information so that your adversary's version of the data can be accepted as true. This is the kind of predicament a conflict of interest can cause. They are to be guarded against by all who are bound by the lawyers' rules of professional conduct, and, in those instances when resolve under the rules appears weak, courts must and will intervene to protect the practices agreed upon.

In this instance, which is seemingly a rare case, the court concludes that defendants' motion to dismiss must be, and it hereby is, denied. The court further concludes that plaintiffs' application for a preliminary injunction must be, and it hereby is, granted to the extent that the defendants and their officers, employees, agents, servants, sureties and assigns be, and each hereby is, enjoined from allowing Panagiotis C. Bayz any access to the ITA's investigations of Makita Corporation *et alia* at the behest of petitioner Black & Decker pending further direction from the court or proceedings herein.

So ordered.