MATSUSHITA ELECTRIC INDUSTRIAL CO., LTD., Kyushu Matsushita Electric Co., Ltd., and Matsushita Electric Corporation of America, Plaintiffs,

v.

UNITED STATES of America, Defendant.

BROTHER INDUSTRIES, LTD. and Brother International Corporation, Plaintiffs,

v.

The UNITED STATES, Defendant.

NAKAJIMA ALL CO., LTD., Plaintiff,

v.

UNITED STATES, Defendant.

Court Nos. 90–12–00631, 90–12–00644, 90–12–00647.

United States Court of International Trade.

March 26, 1992.

Weil, Gotshal & Manges, Stuart M. Rosen, Douglas A. Nave and Karin M. Burke, New York City, for plaintiffs Matsushita Elec. Indus. Co., Ltd., Kyushu Matsushita Elec. Co., Ltd. and Matsushita Elec. Corp. of America.

Tanaka Ritger & Middleton, H. William Tanaka and Patrick F. O'Leary, Washington, D.C., for plaintiffs Brother Industries, Ltd. and Brother Intern. Corp.

Eckert Seamans Cherin & Mellott, R. Sarah Compton, Washington, D.C., for plaintiff Nakajima All Co., Ltd.

Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director, Commercial Litigation Branch, Civ. Div., U.S. Dept. of Justice, Marc E. Montalbine, and Office of the Chief Counsel for Import Admin., U.S. Dept. of Commerce, Pamela A. Green, Washington, D.C., of counsel, for defendant.

Stewart and Stewart, Eugene L. Stewart, Terence P. Stewart, James R. Cannon, Jr. and Todd C. Fineberg, Washington, D.C., for intervenor-defendant Smith Corona Corp.

## OPINION

AQUILINO, Judge:

These actions contest the *Final Scope Ruling; Portable Electric Typewriters From Japan*, 55 Fed.Reg. 47,358 (Nov. 13, 1990), of the International Trade Administration, U.S. Department of Commerce ("ITA") which has arisen out of an antidumping-duty order covering such typewriters ("PETs")[1] and which is summarized as follows:

  ... [T]he addition of an LCD, LED or CRT display and expanded and/or removable text memory does not exempt a PET from the antidumping order. ... [C]ertain later-developed portable electric typewriters, including so-called "personal word processors" [PWPs], are presumptively of the same class or kind as PETs within the scope of the order, if they meet the following seven physical criteria. To be of the same class or kind as a PET a typewriter must: be easily portable, with a handle and/or carrying case, or similar mechanism to facilitate its portability; be electric, regardless of source of power; be comprised of a single, integrated unit; have a keyboard embedded in the chassis or frame of the machine; have a built-in printer; have a platen [roller] to accommodate paper; only accommodate its own dedicated or captive software.[2]

Assessing the merchandise at issue against these criteria, the ITA determined that some 14 imported machines do not satisfy one or another of them and therefore are not within the ambit of the order, whereas a total of eight Panasonic or Brother models are listed as possessing all of the characteristics and thus as within its scope.[3]

The plaintiffs challenge the determination as to those latter models. Each has interposed a motion for judgment on the agency record, contending that the ruling is not supported by substantial evidence and is not otherwise in accordance with law within the meaning of 19 U.S.C. § 1516a(b)(1)(B).

In addition to that section of the Trade Agreements Act of 1979, the statute governing these actions is the Omnibus Trade and Competitiveness Act of 1988, Pub.L. No. 100–418, 102 Stat. 1107, in particular 19 U.S.C. § 1677j(d), which provides:

**Later-developed merchandise**

**(1) In general**

  For purposes of determining whether merchandise developed after an investigation is initiated under this subtitle ...

---

**1.** *See* 45 Fed.Reg. 30,618 (May 9, 1980).

**2.** Footnote 1 to this summary states that the acronyms LCD, LED and CRT stand for liquid crystal display, light emitting diode and cathode ray tube, respectively.

**3.** *See* 55 Fed.Reg. at 47,370. During oral argument, counsel indicated that Nakajima All Co., Ltd. models EW 310 and EW 410 were also determined to be covered by the order.

(hereafter in this paragraph referred to as the "later-developed merchandise") is within the scope of an outstanding anti-dumping or countervailing duty order issued under this title ... as a result of such investigation, the administering authority shall consider whether—

> (A) the later-developed merchandise has the same general physical characteristics as the merchandise with respect to which the order was originally issued (hereafter in this paragraph referred to as the "earlier product"),
>
> (B) the expectations of the ultimate purchasers of the later-developed merchandise are the same as for the earlier product,
>
> (C) the ultimate use of the earlier product and the later-developed merchandise are the same,
>
> (D) the later-developed merchandise is sold through the same channels of trade as the earlier product, and
>
> (E) the later-developed merchandise is advertised and displayed in a manner similar to the earlier product.

\* \* \* \* \* \*

**(2) Exclusion from orders**

The administering authority may not exclude a later-developed merchandise from a countervailing or antidumping duty order merely because the merchandise—

> (A) is classified under a tariff classification other than that identified in the petition or the administering authority's prior notices during the proceeding, or

---

**4.** *See* 48 Fed.Reg. 7,768 (Feb. 24, 1983).

**5.** *See Smith Corona Corp. v. United States*, 13 CIT 96, 706 F.Supp. 908 (1989), *aff'd in part, rev'd in part on other grounds*, 915 F.2d 683 (Fed.Cir.1990).

**6.** Also, just prior to the ruling's publication, Smith Corona filed a new petition with the ITA, aimed at integrated personal word processing systems, which were defined as devices designed principally for the composition and correction of text. *See generally Final Determination of Sales at Less Than Fair Value: Personal Word Processors From Japan*, 56 Fed.Reg. 31,-101, 31,102 (July 9, 1991), wherein the ITA concluded that the merchandise within the scope of

---

> (B) permits the purchaser to perform additional functions, unless such additional functions constitute the primary use of the merchandise and the cost of the additional functions constitute more than a significant proportion of the total cost of production of the merchandise.

In its ruling, the ITA reviews the history of its order which encompasses, *inter alia*, determinations in 1983 that portable electronic typewriters are within the same class or kind as PETs[4] but also in 1987 that such machines with text memories or calculating mechanisms were not covered. *See* 52 Fed.Reg. 1,504 (Jan. 14, 1987). The later determination was subjected to judicial review, which resulted in remand to the agency for reconsideration in light of the court's finding that those machines were

> still dedicated to producing on paper printed letters and other characters as a substitute for handwritten ones through manual use of an electrically-actuated keyboard contained in a unit of such size and weight as to be susceptible to single-hand portage.

*Smith Corona Corp. v. United States*, 11 CIT 954, 963, 678 F.Supp. 285, 292 (1987). The ITA thereupon concluded PETs with calculators were within the scope of its order but that those with text memories were not, which determination was affirmed as to the former and reversed as to the latter *sub nom. Smith Corona Corp. v. United States*, 12 CIT 854, 698 F.Supp. 240 (1988). Then, during appeals from this court's judgment[5], Smith Corona requested the scope ruling now at bar in regard to even "later-developed PETs"[6], essentially

its investigation had the following essential features:

> (1) A customized operating system designed exclusively for a manufacturer's word processor product line which is unable to run commercially available software and which is permanently installed by the manufacturer before or after importation; (2) a word processing software/firmware program which is designed exclusively for the word processor product line and which is permanently installed by the manufacturer before or after importation; and (3) internal memory (both read-only memory (ROM) and read-write random access memory (RAM)) for word processing.
>
> In addition, word processors may include one or more of the following features: (1) An

those with expanded text memories and displays. In other words, during the foregoing litigation, so-called automatic PETs entailed, at most, a few pages of memory displayable electronically a few lines at a time.

In the present litigation, the record depicts increased capabilities in this regard. For example, a Panasonic KX–W1510 has a CRT, which can display as many as 25 rows of 80 characters, and internal text memory for up to 28 pages. A Brother WP–65 possesses a small LCD screen capable of showing 14 lines of 80 characters and a memory for some 16 pages.

The WP–65 was held to be within the scope of the antidumping-duty order, whereas the ITA concluded that the KX–W1510 should be excluded, albeit on the ground that it is "not easily portable".[7] In fact, as indicated above, each of the grounds given for finding the other 13 machines outside the class or kind of covered merchandise was also physical in nature, to wit: "keyboard not embedded in the chassis or frame" or "no built-in printer" or "not comprised of a single, integrated unit". 55 Fed.Reg. at 47,370.

Notwithstanding such grounds, a contention of the plaintiffs is that the ITA did not compare, as specified by the 1988 act, the

general physical characteristics of their electronic PWPs with the "earlier product", which was a portable, electromechanical typewriter. In response to this argument, the agency stated in its ruling:

> ... While we agree ... that the later-developed product should be compared with the earlier merchandise, at the same time, the Department must take cognizance of judicial decisions interpreting the scope of the order at issue.... Therefore, ... we continue, where appropriate, to make comparisons between automatic PETs and the later-developed merchandise subject to this scope inquiry.

55 Fed.Reg. at 47,367.

The ITA was no more at liberty to completely disregard the law developed during the foregoing litigation than it was to disregard the subsequently-passed 1988 act. The record reflects a careful attempt to follow both. Six of the seven criteria relied on by the agency as dispositive of its decision(s) clearly cover the earliest PETs, the only exception being dedicated or captive software, and obviously represent the ITA's method of compliance with the mandate of 19 U.S.C. § 1677j(d)(1)(A), *supra,* in view of the passage of time and concomi-

---

auxiliary memory storage device, whether internal (*e.g.,* RAM storage) and/or external (*e.g.,* which accepts floppy diskettes, RAM cards, or other nonvolatile media); (2) software/firmware designed or modified for use exclusively on a line of word processors (*e.g.,* a spreadsheet or word processing-assist program); (3) an interface permitting the transfer of information to other word processors, telecommunication links, computers, and the like; and (4) a type mode, which permits the word processor to function as a typewriter by typing characters directly onto paper....

All word processors included within the scope of this investigation contain the following three units: (1) A keyboard for the entry of characters, numerals and symbols; (2) a video display; and (3) a chassis or frame containing the essential word processing features listed above. These units may either be integrated into one word processing system or be combined by the user into one working system. Word processors may include, as a fourth unit, a printer with a platen (or equivalent text-to-paper transfer system) and printing mechanism to permit the printing of text on paper. However, word processors which

do not include a printer as one of the major units are also included within the scope of the investigation.

Word processors may be imported as integrated systems, or the major finished units may be imported separately. With respect to major finished units, only the major finished units listed above are covered by this investigation. Keyboards and chassis/frames are included in this investigation if they are designed for use in word processors. Printers and video displays are included in this investigation only if they are dedicated exclusively for use in word processors.

Moreover, the agency's determination specifically excluded machines covered by its ruling herein, as well as personal computers capable of word processing. *See* 56 Fed.Reg. at 31,102.

7. 55 Fed.Reg. at 47,370. Record document ("R.Doc") 95 states at page 663 that CRT displays offer "great clarity but are bulky" and shows at page 666 that kind of KX–W1510 display/printer module essentially independent of its keyboard, connected only by way of a coiled cable.

tant advances in internal electronic circuitry, which the agency itself recognized as "significant". *Id.* However, after review of the record and consideration of the motions thereon, this court is not persuaded that Panasonic KX models W900 and W1025 or Brother WP models 4U, 60, 65, 720, 760D and 1400D or Nakajima EW models 310 and 410 are not still dedicated to producing on paper printed letters and other characters as a substitute for handwritten ones through manual use of an electrically-actuated keyboard contained in a unit of such size and weight as to be susceptible to single-hand portage. Indeed, those models apparently still look like typewriters. *Compare, e.g.,* the Brother WP-4U *with* Brother model AX28. *Cf.* R.Doc. 84, p. 8 ("Consumers can anticipate that if a machine looks like a typewriter, it works like a typewriter"); *Smith Corona Corp. v. United States,* 915 F.2d 683, 687 (Fed. Cir.1990). Of course, this is not to say that PWPs and PETs have identical features; clearly, they do not. *See, e.g.,* R.Doc. 41, Exhibit A.

But, the later-developed merchandise at bar does have the "same general physical characteristics" as the earlier product, which fact can have an impact on the expectations of purchasers and their ultimate use of the machines within the meaning of subsections (B) and (C) of section 1677j(d)(1). With regard to those prescribed statutory considerations, the ITA found that

> purchasers of PWPs are seeking a portable electric typewriter, with the word processing capabilities representing attractive supplementary features. We agree that the ultimate purchasers did not expect the "earlier merchandise" to possess word processing capabilities. We do not, however, agree that the addition of word processing features creates differing customer expectations sufficient to dictate a different class or kind of merchandise.

In addition, we agree that customers willing to pay a price premium for a PWP are interested in the additional features offered on many PWPs.... We do not, however, consider this willingness as dispositive of completely differing expectations. Rather, while word processing capabilities may facilitate the task, we find that customers continue to expect a self-contained, portable machine dedicated to producing on paper printed letters and other characters as a substitute for handwritten ones, through manual use of an electrically-actuated keyboard.[8]

While the record indicates that the original merchandise is no longer on the market (only electronic versions are offered for sale), if the statutory steps are to be followed consistently, as is indicated, reference must still be made to expectations for and use of the electromechanical machines. The Brother plaintiffs refer to retail pricing of those typewriters in a range encompassing prices for PWPs, even without adjustment for inflation. *See, e.g.,* Brother Memorandum, p. 43. *Cf.* R.Doc. 95, pp. 666–67. Their intent is to emphasize price differentials with electronic PETs, which the record also supports—but not to the extent that it supplants the ITA's conclusion that consumer willingness to accept a price premium does not signify completely differing expectations. As stated in the record, *id.* at 665:

> If you've tasted the speed and power of a contemporary computer word-processing system, a personal word processor might come as a disappointment. Compared with a computer, many of these machines are slow. The displays on some are hard to read. The printers on most must be fed by hand, sheet by sheet. And the size of the documents is limited, as is the amount of data you can store on the disks.

Stated another way, once purchased the ultimate use of the merchandise held covered by the antidumping-duty order remains

---

8. 55 Fed.Reg. at 47,369. The agency added that "ultimate use is but one of several criteria which, when considered with physical characteristics and the other criteria set forth in 19 U.S.C. 1677j(d), determine whether later-developed merchandise is in the scope of the outstanding antidumping order." *Id.*

analogous to that of the earlier PETs, albeit with a somewhat greater degree of operator ease. That is, insofar as those PWPs are concerned, they are not at those "levels of sophistication" common to word processors referred to at length by this court in *Smith Corona Corp. v. United States*, 12 CIT at 864–69, 698 F.Supp. at 248–52, familiarity with which is presumed herein. *See also supra* note 6; R.Doc 95 at 665:

> The personal word processors tested ... are "dedicated computers" ... designed for and limited to a single task. For double the money, you can buy a personal computer system that opens up the whole world of computing, including word processing.
>
> The standard assemblage calls for a computer with either a hard disk and a floppy disk drive or two floppy drives, keyboard and monitor, software and printer.[9]

The plaintiffs do not contest the ITA's analysis of the remaining statutory considerations specified by 19 U.S.C. § 1677j(d)(1), namely, similarity of channels of trade and of advertising of the merchandise, but they do rely on the provisions of the 1988 act governing exclusion from an antidumping-duty order, in particular, section 1677j(d)(2)(B), *supra*, which refers to additional functions constituting the primary use of the merchandise and to the cost thereof constituting more than a significant proportion of the total cost of production.

The agency's ruling barely addresses these criteria, apparently on the basis that implicit in its analysis under section 1677j(d)(1) is rejection of the proposition that the additional electronic features of the PWPs in question comprise their primary use. *See* 55 Fed.Reg. at 47,369–70. And, since the standards for possible exclusion under subsection (d)(2)(B) are in the conjunctive, there was no need to address proportionate cost.

**9.** Furthermore, unlike personal computers, PWPs do not have software flexibility.

**10.** *See Consolo v. Federal Maritime Comm'n,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d

Whatever the reasoning, the intent of that part of the 1988 act relied on by the plaintiffs was to counteract circumvention of antidumping-duty orders. It also led to enactment of subsection (d)(2)(B) in a manner so as to restrict the discretion the ITA has, and has had, in determining to continue to enforce such orders. *Cf. Mitsubishi Electric Corp. v. United States*, 898 F.2d 1577, 1582–83 (Fed.Cir.1990); *PPG Industries, Inc. v. United States*, 15 CIT ——, 780 F.Supp. 1389 (1991), *appeals docketed*, Nos. 92–1192, 92–1196 (Fed.Cir.1992). If, on the other hand, exclusion of later-developed, presumptively-covered merchandise were ever mandated, in the light of the history and the language of this enactment the administrative record would have to be more substantial than that presented here regarding a different primary use, at a minimum.

In conclusion, in view of that record and the rule that the possibility of drawing two inconsistent conclusions from its contents does not prevent the ITA's ruling from being supported by substantial evidence[10], plaintiffs' motions for judgment on that record must be denied and their actions dismissed.

131 (1966); *Torrington Co. v. United States*, 14 CIT ——, ——, 745 F.Supp. 718, 723 (1990), *aff'd*, 938 F.2d 1276 (Fed.Cir.1991).